## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CRESTWOOD MEMBRANES, INC. :
t/d/b/a i2M :
 :
   **Plaintiff** :
 :
   v. : **3:13-CV-664**
 : **(JUDGE MARIANI)**
NSF INTERNATIONAL :
 :
   **Defendant** :

**FILED
SCRANTON**

JAN 2 1 2014

PER _____

DEPUTY CLERK

### MEMORANDUM OPINION

### I. Introduction

Before the Court is Defendant's Motion to Dismiss Plaintiff's Amended Complaint

(Doc. 17). For the reasons that follow, the Court will grant Defendant's motion.

### II. Factual Allegations

Plaintiff filed an Amended Complaint on April 29, 2013 (Doc. 12) seeking a

declaratory judgment that the earlier of two contracts it had executed with Defendant was

controlling.

Plaintiff is Crestwood Membranes, Inc., t/d/b/a i2M, a Pennsylvania corporation, and

Defendant, NSF, is a Michigan corporation. (Am. Compl. at ¶¶ 1-2). According to the

Amended Complaint, on May 22, 2012, Christie Shields a representative of NSF, "emailed

to i2M an Application for Evaluation/Testing/Inspection, whereby NSF proposed to provide

testing services relative to a vinyl shower pan liner manufactured by i2M, in exchange for

payment of $6,540.00 by i2M." (*Id.* at ¶ 6). Attaching the application to her e-mail, she said,

"I have provided you with our terms and conditions document in case you would like to proceed. Once I receive that back, I would create a shipping form and send it to you so that you can include it with your product when it is shipped to NSF." (*Id*. at ¶ 7). The application already had been signed by the CFO of NSF, Michael Walsh. (*Id*. at ¶ 8).

Upon receipt of the Shields e-mail and application signed by Walsh, the CFO of i2M, R.C. Riley, signed and dated it on May 25, 2012. A Mr. Martz then e-mailed the signed application back to NSF that afternoon. (*Id*. at ¶ 9). Within an hour of Mr. Martz's e-mail, Ms. Shields responded by e-mail confirming receipt of the signed contract ("Original Contract") and a copy of i2M's check for $6,540. (*Id*. at ¶ 11).

However, later that day, Ms. Shields wrote another e-mail to Mr. Martz which stated, "I accidentally provided [i2M] with an out-dated application/terms and conditions and because our legal language has changed, I need to ask your team to re-sign the correct documents – my apologies for the mistake!" (*Id*. at ¶ 12). i2M's CFO promptly signed this second contract ("Second Contract) that day. (*Id*. at ¶ 13).

As part of its contractual duties under either contract, "NSF was to perform testing of the Shower Pan Liner in accordance with the ASTM Testing Standards and subsequently issue a report to i2M detailing the test results." (*Id*. at ¶ 24). "On July 17, 2012, NSF issued to i2M the pertinent laboratory report, Test Report J-00113182," with the "results of the testing of the Shower Pan Liner. . . ." (*Id*. at ¶ 25). However, NSF allegedly "failed to perform the testing of the Shower Pan Liner in accordance with the ASTM Testing Standards, and

as a result, it subsequently issued [an] inaccurate and misleading Test Report." (*Id.* at ¶ 26). In particular, NSF's Test Report concluded "that the Shower Pan Liner failed the elongation testing pursuant to the ASTM Testing Standards; however, NSF's failure to employ the proper ASTM test methodologies resulted in NSF inaccurately and incorrectly reporting that the elongation testing failed the ASTM Testing Standards." (*Id.* at ¶ 28).

The allegedly erroneous Test Report caused i2M's "Shower Pan Liner to be temporarily suspended from the certificate of listing of the IAPMO R&T[1] . . . , thus causing i2M to expend additional resources and incur costs and expenses in order to ensure proper certification of the Shower Pan Liner. . . ." (*Id.* at ¶ 35).

> As a direct and proximate result of NSF's failures as detailed herein, i2M suffered damages in excess of $600,000.00 due to loss of existing and prospective customers and business relationships, lost sales, loss of business volume, loss of goodwill, and lost profits, in addition to costs and expenses for having proper testing pursuant to the ASTM Testing Standards performed and obtaining proper certification of the Shower Pan Liner following NSF's issuance of the Test Report and the Fault Result.

(*Id.* at ¶ 37).

Both contracts provided for application of Michigan law in the event a dispute arose between the parties. (Original Contract, Doc. 12-3, Ex. C, ¶ M; Second Contract, Doc. 12-6, Ex. F, ¶ 15). However, there were significant differences between the two contracts.

The Original Contract provides the following dispute resolution mechanism:

---

[1] "IAPMO R&T is North America's premier plumbing and mechanical product certification agency. It is accredited by American National Standards Institute (ANSI) and Standards Council of Canada (SCC)." (Am. Compl. at 11, n.2).

> Any controversy or claim arising out of or relating to this contract, or the breach thereof, including any claim for damages, indemnity, contribution, and/or rescission, that cannot be settled through direct discussion between the parties shall first be submitted for an amicable settlement through mediation administered by the American Arbitration Association under its Commercial Mediation Rules. . . .

(Original Contract at ¶ K). In contrast, the Second Contract provides the following dispute resolution mechanism:

> Any legal action by NSF or CLIENT [i2M], . . . shall be brought and maintained exclusively in the United States District Court of the Eastern District of Michigan if it has subject matter jurisdiction, and otherwise in a district or circuit court in the State of Michigan as determined by the venue statutes of the State of Michigan. The parties consent to personal jurisdiction and venue in all such courts, and further agree not to seek to invoke the jurisdiction of any other courts.

(Second Contract at ¶ 13).

The Second Contract also included a limitation of damages provision that was absent in the Original Contract:

> NSF warrants and represents that it shall perform Services in a reasonable and workmanlike manner. NSF makes no other representations or warranties, whether express or implied, with regard to its obligations hereunder or the merchantability or fitness of any goods or products for a particular purpose. NSF shall have no liability to CLIENT or to any third party with respect to its obligations under this Agreement or otherwise for consequential, exemplary, special, incidental, or punitive damages even if NSF has been advised of the possibility of such damages. In any event, NSF's entire liability shall be limited to the amount actually paid to NSF by CLIENT under this Agreement during [the] twelve (12) month period preceding the date of such claim or matter. This limitation applies to all claims in the aggregate, including, without limitation, claims based on breach of contract, breach of warranty, professional negligence, strict liability, misrepresentations, and any other torts or claims.

(*Id*. at ¶ 9). Between the execution of the Original and Second Contract, the parties "did not engage in any negotiations whatsoever. . . ." (Am. Compl. at ¶ 16).

### III. Standard of Review

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio–Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114,118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n. 14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. Analysis

### Which Contract is Valid?

At issue before this Court is which contract is valid. Whichever contract controls this case will determine whether the case proceeds to arbitration or to a state/federal court in Michigan.

Plaintiff argues that the Original Contract controls because the Second Contract was modified without any additional consideration, thus violating the pre-existing duty rule. According to the Supreme Court of Michigan:

> An essential element of a contract is legal consideration. Under the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise. This rule bars the modification of an existing contractual relationship when the purported consideration for the

> modification consists of the performance or promise to perform that which one
> party was already required to do under the terms of the existing agreement.

*Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000) (internal citations omitted). In

contrast, Defendant relies on a Michigan statute which provides:

> An agreement hereafter made to change or modify, or to discharge in whole
> or in part, any contract, . . . shall not be invalid because of the absence of
> consideration: Provided, That the agreement changing, modifying, or
> discharging such contract, . . . shall not be valid or binding unless it shall be in
> writing and signed by the party against whom it is sought to enforce the
> change, modification, or discharge.

MICH. COMP. LAWS ANN. § 566.1.

Having reviewed the relevant case law cited by the parties, the Court concludes that

Defendant is correct, and the Second Contract is binding on the parties.

First, *Yerkovich*, on which Plaintiff relies, is factually distinct from this case in a

number of ways. In *Yerkovich*, the plaintiff was a participant in a self-funded employee

welfare benefit plan under ERISA whose daughter suffered injuries in a car accident. 610

N.W.2d at 543. Initially, the fund denied coverage for medical expenses because the plaintiff

had not executed a subrogation agreement. *Id.* Once the plaintiff signed the subrogation

agreement, the fund paid $6,832 in medical benefits. Thereafter, the plaintiff recovered

benefits from a third-party tortfeasor, and the fund sought reimbursement from the plaintiff

under the subrogation agreement. The Michigan Supreme Court concluded:

> Although the agreement provides that the fund may "recover *from the person
> who caused the injury*," (emphasis in original) the fund seeks to recover
> instead from plaintiff. It has done so by arguing that the second agreement
> signed by plaintiff required plaintiff to repay, reimburse, subrogate, and assign

> sums and rights to the fund. It is agreed that plaintiff signed the second agreement – that greatly expanded her duties under the plan agreement – *only after the fund conditioned the payment of medical expenses on her signing the second agreement.* (emphasis added).

*Id.* at 544-45. According to the court, the fund "was under a preexisting duty to pay plaintiff's medical expenses and could not *require* her to take on additional duties absent additional consideration." *Id.* at 545-46 (emphasis added). The Supreme Court of Michigan held that under the original agreement between the plaintiff and the fund,

> Plaintiff was required only to sign documents ensuring the fund's right of subrogation as defined by the fund. The second agreement instead attempted to add to plaintiff's duties and burdens. The second agreement added an obligation to "repay" sums paid by the fund out of "any judgment or settlement" she received. The next paragraph required her to "reimburse" the fund out of any recovery she received. Although the third paragraph included subrogation rights, we will not interpret the language to allow greater rights or duties than those in the original plan agreement. The final paragraphs added assignments of plaintiff's claims and rights to the fund. The result is that plaintiff took on additional obligations, without consideration, in order to be paid that which she was already owed. All such additional obligations are unenforceable.

*Id.* at 546. Implicit in the court's opinion is that the fund refused to fulfill its obligations unless the plaintiff signed an additional agreement which gave the fund greater rights. Furthermore, plaintiff was a participant, as defined in 29 U.S.C. § 1002(7), in the fund's plan, and, as such, was owed a fiduciary duty under the provisions of ERISA including, *inter alia,* the provisions of Section 1104 which provides in part that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for

the exclusive purpose of: (i) providing benefits to participants and their beneficiaries . . . ."

29 U.S.C. §1104.

A subsequent Michigan Superior Court decision distinguished *Yerkovich* from the

facts of its case by saying:

> In *Yerkovich*, the plaintiff was *required* to sign a second agreement imposing
> additional obligations in order to receive what she was owed under the first
> agreement. The defendant had a preexisting duty to the plaintiff under the first
> contract, so the plaintiff was not required to assume additional obligations to
> receive what she was already owed. We are not presented with an issue of
> preexisting duty here.

*Adell Broadcasting v. Apex Media Sales*, 708 N.W.2d 778, 781-82 (Mich. Ct. App. 2005)

(emphasis added).

In *Adell*, the defendant had been Adell's exclusive media representative for

broadcast spot and program sales for nearly ten years. *Id*. at 780. However, Adell was

dissatisfied with Apex's responsiveness to its needs and the value of air time Apex had sold.

In turn, Apex was dissatisfied with Adell because of outstanding commissions payments

Adell owed to Apex. In February 2002, the parties executed a modification that called for

Adell to pay $370,000 as full satisfaction on commissions owed to Apex through 2001, a

reduction in Apex's commission from 15% to 10%, and a 30-day termination provision. *Id*.

Despite these changes, Adell eventually sued Apex, which filed a countercomplaint seeking

rescission of the modified agreement. Based on these facts, the Superior Court held:

> In this case, there was a bargained modification to the parties' agreement. It
> is axiomatic that parties to a contract may contract to modify the contract by a
> later agreement. *Quality Products & Concepts Co. v. Nagel Precision, Inc.*,

469 Mich. 362, 372–373, 666 N.W.2d 251 (2003). There must be mutual assent for the modification, and a modification will be considered mutual if it is established through clear and convincing evidence of a written agreement establishing a mutual agreement to waive the terms of the original contract. *Id.* In this case, the parties waived certain terms of their original agreement in a signed writing. In doing so, the parties considered the changes to their advantage. The fact that parties consider it to their advantage to modify their agreement is sufficient consideration. *Buck v. Northern Dairy Co.*, 364 Mich. 45, 49, 110 N.W.2d 756 (1961); MCL 566.1. No other consideration for the amended agreement was necessary.

*Id.* at 782. Defendant also relies on *Plante & Moran Cresa, L.L.C. v. Kappa Enterprises, L.L.C.*,[2] which stated in a footnote:

Michigan's law provides a path around the preexisting duty rule in certain circumstances. If parties to a contract consider modification mutually beneficial, such an agreement will not fail for lack of consideration provided the agreement is in writing and signed by the party against whom enforcement is sought. *See* Mich. Comp. Laws § 566.1 (stating that "[a]n agreement hereafter made to change or modify ... any contract ... shall not be invalid because of the absence of consideration [if] the agreement changing ... such contract [is] in writing and signed by the party against whom it is sought to enforce the change"). But P&MC has come forward with no writing signed by Kappa evidencing the alleged modification. *Cf. Adell Broad. Co. v. Apex Media Sales, Inc.*, 269 Mich.App. 6, 708 N.W.2d 778, 782 (2005) ("In this case, the parties waived certain terms of their original agreement in a signed writing. In doing so, the parties considered the changes to their advantage.").

251 F. App'x 974, 975, n.1 (6th Cir. 2007). According to Defendant, *Plante & Moran* is consistent with *Adell* because there was no signed writing in *Plante & Moran* that would bring the case within the ambit of § 566.1 and outside the reach of the preexisting duty rule.

---

[2] In that case, the plaintiff sought $105,000 in additional payment for services it provided to the defendants after flooding and construction delays, "claiming this work went above and beyond the parties' original contract." 251 F. App'x 974, 974 (6th Cir. 2007).

Finally, Defendant cites to *Janson v. Egypt Valley Country Club*, No. 1:08-CV-981, 2009 WL 6582418 (W.D. Mich. Nov. 30, 2009). In *Janson*, the plaintiff sued the defendants on two breach of contract claims based on a 2001 contract, instead of the 2004 or 2007 contracts he had executed subsequently. He argued that the later contracts were "without consideration and thus of no effect, and that the 2001 contract still controls." *Id.* at *3. The magistrate judge disagreed for three reasons: "First, the 2001 contract specifically contemplated review by the parties in 2004, 2007 and 2009. Second, under Michigan law, specifically with respect to employment contracts, the employee's continued employment after the employer alters the terms of their agreement is consideration for the new agreement or modification. *Id.* (citations to record omitted). Third, § 566.1 permitted the modifications without additional consideration. *Id.* The judge distinguished *Yerkovich* by reasoning:

> Plaintiff could have stood on the 2001 contract and refused to modify it, suing the Defendant if he thought it was breached. However, what he did instead was to agree to modify the contract and continue working for Egypt Valley Country Club, clearly bringing MCL § 566.1 into play. . . . *Yerkovich* is inapposite. In *Yerkovich* there was no ongoing relationship between the parties. It involved the one time interpretation of the insured's and insurer's rights under an insurance contract. There was no ongoing relationship to serve as consideration for the modification(s) made by agreement to the parties' relationship.

*Id.*

In *Adell*, neither party required the other party to sign a modification agreement to receive benefits it was already entitled to receive. Furthermore, unlike the parties in

*Yerkovich*, the parties here were in a position of relatively equal bargaining power. Finally,

the Original Contract provided that "[n]o amendment to or variance from this Agreement

shall be binding on either party *unless signed in writing by the parties*." (Original Contract at

¶ N). That is, the Original Contract allowed for modification without additional consideration.

Both parties signed the Second Contract, so even under the express terms of the Original

Contract which Plaintiff relies on without reservation, the Second Contract was a binding

modification.

Plaintiff attempts to distinguish *Adell* from this case by arguing that in *Adell*, there

was an actual bargained-for modification that is absent from this case. However, on closer

examination, the consideration present in *Adell* for the amended agreement which the Court

found valid is the same consideration present here, *i.e.*, the continuation of the business

relationship between i2M and NSF:

> Here, the consideration for the amended agreement was the continuation of
> the parties' business relationship. After the amendment was made, plaintiff
> actively contacted potential clients and asked them to deal with Hart, and
> AMS continued to represent WADL TV 38. Nothing in the record reveals that
> plaintiff hired another marketing firm to handle the business of WADL TV 38,
> rejected business obtained by AMS, or interfered with the ability of AMS to
> obtain business for WADL TV 38. The parties continued their business
> relationship, so there is no question of material fact that there was no failure
> of consideration.

708 N.W.2d at 783.

Here, i2M, when presented with a request from NSF to execute a second

agreement, did so and thereby continued its business relationship with NSF.

12

Furthermore, Plaintiff points out that in *Plante & Moran*, the Sixth Circuit required that "parties to a contract" must "consider modification mutually beneficial" for a modification to be valid. Finally, Plaintiff points out that in *Janson*, the parties had an ongoing relationship spanning many years, whereas here, the case involves a "one-time interpretation" of which contract controls. Plaintiff's arguments are valid and non-frivolous, but the Court will reject them for the following reasons.

"While the freedom to contract principle is served by requiring courts to enforce unambiguous contracts according to their terms, the freedom to contract also permits parties to enter into new contracts or modify their existing agreements." *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 257 (Mich. 2003). "A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written. Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005).

"A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Calhoun Cnty. v. Blue Cross Blue Shield Michigan*, 824 N.W.2d 202, 209 (Mich. Ct. App. 2012) (internal citations and quotation marks omitted).

> It is well established that failure to read an agreement is not a valid defense to enforcement of a contract. A contracting party has a duty to examine a contract and know what the party has signed, and the other contracting party cannot be made to suffer for neglect of that duty.

*Montgomery v. Fid. & Guar. Life Ins. Co.*, 713 N.W.2d 801, 804 (Mich. Ct. App. 2005)

(internal citations and quotation marks omitted). "Michigan law presumes that one who signs

a written agreement knows the nature of the instrument so executed and understands its

contents." *Watts v. Polaczyk*, 619 N.W.2d 714, 717 (Mich. Ct. App. 2000) (citing *McKinstry*

*v. Valley Obstetrics-Gynecology Clinic, P.C.*, 405 N.W.2d 88, 96 (Mich. 1987).

Here, when Defendant realized its mistake, Ms. Shields (of NSF) immediately e-

mailed Mr. Martz (of i2M) and informed him that the first contract was outdated and

"because *our legal language has changed*, I need to ask your team to re-sign the correct

documents – my apologies for the mistake!" (Am. Compl. at ¶ 12) (emphasis added). This e-

mail provided notice to Plaintiff that the Second Contract contained alterations that may

have been material to the contract. It was incumbent on Plaintiff's representatives to read it

(*Montgomery*, 713 N.W.2d at 804) before executing it because "Michigan law presumes that

one who signs a written agreement knows the nature of the instrument so executed and

understands its contents." *Watts*, 619 N.W.2d at 717.

The express terms of the Second Contract provide that in the event a dispute arises,

the parties shall proceed "exclusively in the United States District Court of the Eastern

District of Michigan if it has subject matter jurisdiction, and otherwise in a district or circuit

court in the State of Michigan as determined by the venue statutes of the State of Michigan."

(Second Contract at ¶ 13). These express terms are evidence of the objective intentions of

the parties, and a court must enforce "unambiguous contracts according to their terms."
*Quality Products*, 666 N.W.2d at 257.

Therefore, although Plaintiff objects that there was neither a bargained-for
modification the parties considered mutually beneficial, nor an ongoing relationship to justify
the application of § 566.1, the Second Contract is a writing signed by both parties which
provides objective evidence that the parties did consider the modifications mutually
beneficial. Thus, the Court finds the Second Contract is controlling, and its forum selection
clause requires this case to proceed in a Michigan court.[3]

<u>Whether the Limitation of Liability Provision in the Second Contract is Enforceable</u>

The issue of whether the Limitation of Liability provision in the Second Contract is
enforceable and the corollary issue of whether the amount in controversy is sufficient to
meet the requirements for diversity of citizenship jurisdiction in the Eastern District Court of
Michigan present matters which the parties have agreed in the Second Contract must be
addressed, in the first instance, in the United States District Court for the Eastern District of
Michigan. Should that court determine that it lacks subject matter jurisdiction because the
Limitation of Liability provision is enforceable, thus limiting the Plaintiff's damages to the
sum of $6,540.00, the amount it paid to NSF, then this case will proceed in the courts of the
State of Michigan pursuant to that state's venue statutes.

---

[3] Because the Court finds that the Second Contract controls this case, under the terms of the Second Contract, this case should proceed in a Michigan court. Therefore, it is unnecessary for the Court to address the portion of Defendant's Motion to Dismiss based on improper venue.

## V. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss (Doc. 17). A separate Order follows.

Robert D. Mariani
United States District Judge